# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

DOWN-LITE INTERNATIONAL, INC.,

    Plaintiff,

    vs.

DEFENDANT ALTBAIER, *et al.*,

    Defendants.

Civil Action No. 1:19-cv-627

Dlott, J.
Bowman, M.J

## REPORT AND RECOMMENDATION

This civil action is now before the Court on Plaintiff Down-lite International, Inc.'s ("Down-lite") motion for a preliminary injunction (Doc. 2. Ex. A). Down-lite filed a complaint in the Hamilton County Court of Common Pleas on July 19, 2019 seeking injunctive and compensatory damages. Plaintiff brings three claims against Defendant Chad Altbaier and his company Paice Partners Global, LLC (Paice) alleging misappropriation of trade secrets, breach of an employment agreement, and breach of a shareholder agreement. The state court held a hearing on July 22, 2019 regarding Down-lite's motion for Temporary Restraining Order (TRO), which it granted the same day. Thereafter, Defendants filed a notice of removal to this Court as well as motions to dissolve the TRO and vacate the expedited discovery order and hearing date previously set by the state court. On August 1, 2019, Defendants also filed a motion to change venue and consolidate with a related action Defendants filed in the Untied States District Court for the Northern District of California.

The Court denied Defendants' motion to transfer venue and motion to dissolve the temporary restraining order. (Doc.15). The Court also extended the temporary

restraining order entered on July 22, 2019 until such time as the hearing on the preliminary injunction was concluded. (Doc. 18).

The undersigned held a comprehensive four-day hearing on the motion for a preliminary injunction on August 26, 2019 through August 29, 2019. Thereafter, the parties each submitted findings of fact and conclusions of law. (Docs. 55, 56). Upon careful review and for the reasons that follow, the undersigned herein recommends that Plaintiff's motion for a temporary restraining order be denied.

## I. Background and Facts

Plaintiff Down-lite designs, manufactures, and sells down and feather filled bedding for the retail and hospitality channels. (Tr. at 1-135; 2-170). (Doc. Ex. 1 to Plaintiffs' Request for TRO, Declaration of Marvin Werthaiser). Down-lite is an Ohio close corporation owned by three shareholders: Marvin and Larry Werthaiser (who are brothers), and Robert Altbaier (a long-time friend of Larry's and business partner). Down-lite refers to these owners as the "G1" or first generation. (Tr. at 3-31). Down-lite considers children or children-in-law of Marvin, Larry and Robert as "G2" or second generation. Some of them work for the Company and some do not. (Tr. at 3- 78). Defendant Altbaier is Robert Altbaier's son.

Defendant Altbaier began his employment with Down-lite in December 2001 as a Management Trainee. Most recently, Mr. Altbaier served as the Vice President of Down-lite's Outdoor Division. (Tr. at 1-75; Tr. at 1-111,112; Tr. at 4-9). After several years in a sales position with Down-lite (2002-2008), Mr. Altbaier became Down-lite's Vice President for Sales and Marketing. In that role he had responsibility for all Down-lite sales, which was a position/role that required substantial time working in Ohio.

Accordingly, from 2008 to 2013 Mr. Altbaier "commuted" to Ohio "like almost every other week." (See, PI Tr. 2-167 to 2-168; and 2-170).

Notably, in December 2003, Altbaier began working for Down-lite out of his office in San Francisco, California. (Tr. at 1-178). In September 2010, he moved a short distance to Burlingame, California, where he continued to work on behalf of Down-lite. In 2013, to facilitate Mr. Altbaier's desire to reduce his required commute to Ohio, Down-lite created a position for Mr. Altbaier by creating an outdoor division. (Id., 1-32; 4-9). The Outdoor division sells only down insulation to outerwear brands, who in turn make and sell items such as jackets and sleeping bags. (Tr. at 1-6). Prior to 2010-2011, Down-lite was not previously in the business of selling down insulation to the outerwear market. (Tr. at 1-32). Defendant began selling down insulation to the outerwear market on behalf of Down-lite around 2010-2011. (Tr. at 1-33; Tr. at 1-111,112).

Mr. Altbaier worked with "complex and technically nuanced products" and was Down-lite's sole salesperson for outerwear. (Doc. 42, Tr., 1-33; 1-73).  He had minimal oversight and "kind of dictated" what he did. (Tr. 1-249). He developed "significant relationships," including strong personal relationships and friendships for Down-lite. (Tr. 1-34). Importantly, he developed "great trust and great goodwill" with these customers and their key personnel. (*Id.*, 1-34 to 1-35; 1-44). And, most significantly, Mr. Altbaier's relationship with the key personnel of Down-lite's top five outdoor customers was especially strong/tight. Id. Those five customers will account for $25,000,000 in annual revenue in 2019: 17% of all Down-lite revenue. (*Id.* 44-45).

In 2009, Down-lite required Mr. Altbaier to enter into a non-negotiable employment agreement that contained Restrictive Covenants. The 2009 Agreement

contains a one-year non-compete restriction. (Tr. at 2-4). The 2009 Agreement expressly defines Down-lite's business at that time as "manufacturing bedding and home furnishings products." (Defendant's Ex. A). The 2009 Agreement only applies to business in which Down-lite engaged in at the time. This does not include supplying down insulation to the outerwear market. (Tr. at 1-3, 4).

In 2013, while Mr. Altbaier still resided and worked in California, Down-lite required him to sign an Amended and Restated Close Corporation and Shareholder Agreement (the "2013 Shareholder Agreement"). Mr. Altbaier was advised by his father Robert that this document must be signed and signed quickly. (Tr. 1-117). Defendant signed the 2013 Shareholder Agreement in California. (Tr. at 3-151). The signature page of the 2013 Shareholder Agreement includes the following Parties: Down-lite, its three shareholders (Larry, Marvin, and Robert), and nine separate trusts, each relating to one of the foregoing owners. (Tr. 1-120).

Defendant Altbaier is not an owner of Down-lite. He does not own any shares of voting or nonvoting stock in Down-lite. Rather, Defendant was one of three co-trustees of the Robert H. Altbaier Family Grantor Trust of 2012 (the "Trust") – a Trust vehicle that owns solely non-voting shares in Down-lite. As a Trustee of the Trust, Defendant does not hold any ownership interest in Down-lite. As a Trustee of the Trust, Defendant is not permitted to make any unilateral decisions regarding the Trust. As a result, he cannot transfer any of the Trust's shares without the consent of the co-trustees (defined collectively in the Trust Agreement as the "Trustee"). (Tr. 1-120). The 2013 Shareholder Agreement purported to impose "Restrictive Covenants" on shareholders during the time that shareholder "holds" shares of Down-lite and for two (2) years thereafter. The

4

non-competition clause contains no geographic restriction. (Tr. 1-139). Defendants argue that one of the reasons for Down-lite's creation of the 2013 Shareholder Agreement was to ensure that none of the three owners could take actions that would affect the company without the knowledge and agreement of the others.

In late 2018, Down-lite found itself struggling in an extremely poor financial position, with bankruptcy looming as a possibility. (Tr. at 1-273). Down-lite was making payroll and paying suppliers by tapping into its bank credit. (Tr. at 1-222). Down-lite currently is operating under a lender forbearance or loan workout agreement pursuant to which Down-lite must take certain actions before the agreement expires on November 1, 2019. (Tr. at 2-86, 87).

In response to Down-lite's financial struggles, Josh Werthaiser stepped down as the Company's CEO and the Company scrambled to identify a new CEO. Hastily, Down-lite promoted a brand new sales manager, Lisa Pruett to interim CEO. (Tr. at 2-107). Pruett had no experience as a CEO and no experience in the bedding or outerwear industries prior to arriving at Down-lite. (Tr. at 2-100, 101). The week following the preliminary injunction hearing, Pruett resigned from Down-lite.

At the end of 2018, Down-lite reduced the salary of Altbaier and his wife, who works for Down-lite, with a promise that the reduction would be made up in the first half of 2019. (Tr. at 2-227; 1-223, 224). During the first half of 2019, Down-lite was going through layoffs and closing factories. Defendant Altbaier was concerned about his family's future financial stability with both parents working for a company with a bleak future. (Tr. at 1-224). Defendant Altbaier began looking for alternate means of

supporting his family that would capitalize on his professional skills without damaging the family company for which both he and his wife worked.

To that end, Defendant Altbaier formed a new business, PAICE Partners Global, LLC on April 30, 2019. (Tr. at 1-12). With its principal place of business in Defendant's home office in Burlingame, California, PAICE would be in the business of developing, marketing and selling high quality raw materials to the apparel industry, with a strategic focus on insulation supply to the outerwear market. (Tr. at 1-102). Mr. Altbaier wanted PAICE to partner with Down-lite in the supply chain. (Tr. at 1-113; 1-116). Defendant Altbaier had hoped to serve as an exclusive independent sales representative to Down-lite, using Down-lite as PAICE's exclusive down material supplier to the outerwear business. (Tr. at 2-148). Down-lite has utilized other independent sales representatives – including Defendant's wife, Lauren, for the past 10 years. (Tr. at 2-43).

Mr. Altbaier was transparent with Down-lite about his plans for PAICE. He shared his draft written business plan with Josh and Hailey Werthaiser[1] at a breakfast meeting on May 20, 2019. (Tr. at 1-228, 229). Prior to the meeting with Josh and Hailey, Defendant Altbaier shared the same plan with Doug Meyer.[2] (Tr. at 2-71,76). Meyer was very receptive of the plan, and offered his congratulations to Defendant, including a "fist bump." (Tr. at 1-229). At Meyer's suggestion, Altbaier then shared the business plan with CEO Lisa Pruett. Pruett initially was receptive of the plan and gave Altbaier a hug. (Tr. at 1-233, 234).

Meyer informed Defendant Altbaier that he and Pruett would take the lead in negotiating the terms of the agreement to serve as a sales representative for Down-lite.

---

[1] Hailey is Marvin Werthaiser's daughter. Josh, Hailey and Chad were considered G-1.5's by Marvin.
[2] Doug Meyer is an advisor to Down-lite.

They also specifically suggested that Marvin Werthaiser be removed from the negotiations to keep the communications simple and efficient. (Tr. at 1-235).

That same day, and with knowledge of Down-lite, Defendant traveled to Toronto to provide a presentation to outerwear a Canadian brand customer with the goal of securing additional business for Down-lite. (Tr. at 2-16). Notably, those meetings in late May resulted in that company increasing its business with Down-lite by a factor of three. (Tr. at 2-16).

On May 23, 2019, Defendant received a call from Meyer, and Down-lite's counsel Brad Haas mentioning the Restrictive Covenants in the various agreements. (Tr. at 1-236). Up until this point, Defendant Altbaier did not recall having signed any documents that contained Restrictive Covenants. (Tr. at 1-146). Further, it was Defendant Altbaier's understanding that Restrictive Covenants were illegal in California.

On June 6, 2019, Defendant Altbaier initiated a conference call with Meyer, Pruett, and his father, Robert Altbaier. (Tr. at 1-236). For the first time, Pruett told Defendant that she did not support the idea of him serving as an exclusive sales agent for Down-lite, but the parties to the call ultimately agreed that she and Meyer would work on a financial proposal for Defendant Altbaier, and they would talk again the following week. (Tr. at 1-236).

On June 13, 2019, Defendant Altbaier had a previously scheduled, regular bi-weekly touch-base call with Pruett. He asked her about the proposal. She responded that she had not had a chance to work on it, but that they would talk about it next week at the Outdoor Retailer show in Denver, which she had decided to attend with him. (Tr. at 1-236).

On June 14, 2019, Defendant received a curt phone call from Pruett. She said that: "Down-lite is not going to move forward with you. I am not going to f\*\*king[3] placate family. Down-lite doesn't need you, and we will be fine without you. These are Down-lite's customers, not yours. The optics of your departure are not good for the company, both internally and with the bank. Good luck with your new business, as Down-lite will not be a part of it." She also stated that if Mr. Altbaier were not part of the family, she would have fired him. (Tr. at 1-238).

On June 18, 2019, Defendant attended the Outdoor Retailer show in Denver, accompanied by Pruett. (Tr. at 1-239). Pruett had not attended the trade show before and she requested that Defendant Altbaier introduce her to customers. Defendant obliged. During their time together at the show, Pruett provided very mixed signals. (Tr. at 1-239). She said that if Defendant wanted to try to make more money as a Down-lite employee, she would see about having Defendant take on more responsibilities with the bedding side of the business. (Tr. at 1-237).

On June 20, 2019, Defendant sent an email to Pruett reiterating his plans for starting PAICE by July 1, 2019. (Tr. at 1-239). On June 24, 2019, Pruett responded with a list of what she expected of Defendant during his last week. (Tr. at 1-239). Defendant complied with all of Pruett's directives and acted diligently to transition his work to others at Down-lite to minimize any disruption to Down-lite or its customers. (Tr. at 3-66, 67).

Between May 20, 2019 and June 30, 2019, Defendant closed significant business deals for outerwear business on behalf of Down-lite, many of which were seasonal, year-long contracts, going through the summer of 2020. (Tr. at 4-29). These

---

[3] Sanitized by the Court.

customers included some of Down-lite's largest outerwear brand partners, representing more than 80% of Down-lite's total outdoor revenue. (Tr. at 4-29).

On June 25, 2019, counsel for Down-lite sent a letter to Defendant Albtaier purporting to remind him of his Restrictive Covenants and threatening litigation. (Tr. at 3-155). Nonetheless, Defendant Altbaier continued to provide his best efforts to Down-lite during his last week of employment to ensure a smooth hand-off – to his very last day, even offering to assist Josh Werthaiser the following week after his departure, regarding any pending topics or questions. (Tr. at 238, 239). No one from Down-lite notified Defendants (or Defendants' counsel) that it planned to file a lawsuit against Mr. Altbaier and PAICE in Ohio on July 19, 2019, or that it would be seeking an ex parte injunction on July 22, 2019. (Tr. at 2-234).

Down-lite kept its intention to sue Mr. Altbaier a secret from two of the three owners. (Tr. at 2-126). No one at Down-lite informed Robert Altbaier that his own company was about to sue his son. (Tr. at 3-127,128). No one told Larry Werthaiser that Down-lite was about to sue Chad Altbaier. (Tr. at 2-126). Robert Altbaier testified that had he been told in advance of the plan to sue, he certainly would have objected to it.

After obtaining the ex parte Temporary Restraining Order in state court, Down-lite's counsel sought to prevent Defendant Altbaier from attending a trade show in New York City the week of July 22, 2019 called the TexWorld Show. Although attendance at this show did not violate the TRO, Defendant respected Down-lite's request and did not attend. Rather, Defendant attended a different trade show, the Functional Fabric Fair. (Tr. at 1-12). At that show, Defendant met with only a few zero-down polyester suppliers and no customers/prospects. (Tr. at 193)

After July 22, 2019, Defendant had three email exchanges using his PAICE email account, none of which violated the TRO, including:

a. Email to Rick Fowler to follow-up on non-competitive, non-down consulting work, August 11, 2019.

b. Email to Phil Graves dated July 31, 2019 acknowledging Graves' introductions to Defendant of new contacts for potential non-down consulting (none of whom was associated with Down-lite); followed by Graves asking Defendant a question dated August 5-7, 2019. Defendant did not provide any specific response to him.

c. Email exchange with Jean C. Rouyer of Advansa regarding non-competitive, non-down consulting work dated July 23-July 27, 2019.

(Tr. At 1-24, 78. 89, 83, 84).

Additionally, during the preliminary injunction hearing, Marvin Werthaiser revealed that he had formed a secret company with his daughter Hailey Werthaiser in May 2019 known as Continental Feather and Down. (Tr. at 2-236, 237). They formed the company in the event that Down-lite filed for bankruptcy or otherwise terminated its business operations. (Tr. at 2-237). Marvin Werthaiser registered the company with the state of Ohio. Marvin Werthaiser claimed that he has not yet transacted any business through Continental Feather and Down. (Tr. at 4-26). There is no evidence that Down-lite has taken any action to enforce any alleged Restrictive Covenants against Marvin Werthaiser or Hailey Wethaiser.

## II.     Standard of Review

The purpose of a preliminary injunction is to preserve the status quo. *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 227 (6th Cir. 1996). In considering a preliminary injunction, the court considers four elements: (1) a substantial likelihood of success on the merits; (2) a substantial threat that the movant will suffer irreparable injury if the injunction is denied; (3) that the threatened injury outweighs any damage

that the injunction might cause the defendant; and (4) that the injunction will not disserve the public interest. *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014).

### III. Analysis

### A. Likelihood of Success on the Merits

#### 1. Contract Claim

Based upon Defendants' actions outlined above, Plaintiff argues that Defendants should be enjoined from working in the outdoor market and from soliciting Down-lite's customers and prospects until the full duration of an injunction may be determined. Pursuant to the Shareholder agreement, Plaintiff argues that Defendant Altbaier:

(1) Promised that he would not "within the United States" own an entity that competes with Down-lite;

(2) Agreed that all customers and prospective customers of Down-lite shall be solely the "Customers" of Down-lite;

(3) Promised that he would not initiate any communication with any Down-lite Customer concerning goods or services if those goods and services are even indirectly competitive with Down-lite's business or prospective activities;

(4) Promised that he would not accept any business from any Down-lite Customer with respect to the sale of goods or services if those goods and services are even indirectly in competition with Down-lite's business or Down-lite's prospective activities;

(5) Promised that he would not cause any Down-lite Customer to decrease the amount of business it does with Down-lite; and

(6) Promised that, except for generally known information, he would not at any time directly or indirectly use information known by him as a result of his involvement with Down-lite including information about customers, suppliers, products, processes, services, prices, techniques, trade secrets, financial condition, plans, prospects, policies, or procedures, or uses or improvements thereof or know-how related thereto ("Confidential Information").

(Doc. 56).

Applying Ohio Law, Plaintiff contends that the restrictive covenants outlined in the Shareholder Agreement are reasonable and enforceable. Notably, in *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 325 N.E.2d 544 (1975), the Ohio Supreme Court held that Ohio uses a test of "reasonableness" when determining whether to enforce a noncompete provision in an employment contract. *Id*. The reasonableness test "permits courts to determine, on the basis of all available evidence, what restrictions would be reasonable between the parties." *Id.* at 25. *Raimonde* outlined factors that a court should examine to determine the reasonableness of a restraint on trade, namely: (1) to the absence or presence of limitation as to time and space; (2) whether the employee possesses trade secrets; (3) whether the covenant seeks to eliminate competition that would be unfair to the employer or merely seeks to eliminate ordinary competition; (4) whether the covenant seeks to stifle the inherent skill and experience of the employee; (5) whether the benefit to the employer is disproportional to the detriment to the employee; (6) whether the covenant operates as a bar to the employee's sole means of support; and (7) whether the forbidden employment is merely incidental to the main employment.

Down-lite argues that it has demonstrated the reasonableness of the restrictive covenants in the Shareholder Agreement because:

• There are limitations as to time and space;

• Mr. Altbaier was the sole contact with the customer;

• Mr. Altbaier has confidential information or trade secrets;

• The covenants eliminate competition which would be unfair;

• The covenant does not seek to stifle inherent skill and experience of the employee – its directed at his misuse of Down-lite information and Mr. Altbaier has skills that he can use easily in non-competitive roles;

• The benefit to the Down-lite is its ability to continue to exist. Meanwhile the detriment to Mr. Altbaier is that he may have a short-term loss of pay before he finds a job that pays the same or, likely more than what he was paid at Down-lite;

• the covenant does not operate as a bar to Mr. Altbaier's sole means of support;

• The "talent" at issue was developed during the last six years; and

• The forbidden employment is Mr. Altbaier's main employment during his final years with Down-lite.

(Doc. 56 a 23).

Down-lite argues that it has a strong protectable interest because its customers are customers of the entity, not customers who came to Down-lite because of Mr. Altbaier. Down-lite invested heavily in Mr. Altbaier for seventeen years. He then left to compete with a plan to perform the same function directed at the same customers he serviced and garnered confidential information from while employed with Down-lite. The Shareholder Agreement does not impede Mr. Altbaier's livelihood. Rather, it seeks to prevent him from soliciting his former customers in order to give Down-lite critical protection of its customer relationships for a limited but reasonable time. In light of the foregoing, Plaintiff argues that it has shown a likelihood of success on the merits.

Defendants, however, argue that California law should be applied to the Shareholder Agreement. Notably, California law prohibits restrictive covenants even when contained in shareholder agreements. Accordingly, Defendants contend the restrictive covenants outlined in the Shareholder Agreement are unenforceable under California law.

Defendants next contend that Down-lite's material breaches of the 2013 Shareholder Agreement bar its contract claims and excuse Defendant from future performance. Notably, "it is a condition of each party's remaining duties to render performances…that there be no uncured material failure by either party." Restatement of the Law 2d, Contracts, Section 237 (1981). Ohio courts apply Restatement of Contracts § 241 to determine if a breach is material. *Arthur J. Gallagher & Co. v. Anthony*, No. 16-CV-00284, 2016 WL 4523104, at *21 (N.D. Ohio Aug. 30, 2016).

As such, to determine whether Down-lite committed material breaches under Ohio law, the Court must examine: (1) the extent to which Defendant will be deprived of the benefit which he reasonably expected; (2) the extent to which Defendant can be adequately compensated for the part of that benefit of which he will be deprived; (3) the extent to which Down-lite will suffer forfeiture if the restrictive covenant is not enforced; (4) the likelihood that Down-lite will cure its failure, taking account of all the circumstances including any reasonable assurances; and (5) the extent to which Down-lites's behavior comports with standards of good faith and fair dealing" *Arthur J. Gallagher & Co. v. Anthony*, No. 16-CV-00284, 2016 WL 4523104, at *21 (N.D. Ohio Aug. 30, 2016) citing Restatement of Contracts § 241 (1981). The notes to Section 241 go on to state: "This Section therefore states circumstances, not rules, which are to be considered in determining whether a particular failure is material." *Ohio Educ. Ass'n v. Lopez*, 2010-Ohio-5079, ¶ 15.

"If one party to the contract fails to perform as promised, then there is a failure of consideration, and the other party need not perform his promise." *Siemaszko v. FirstEnergy Nuclear Operating Co.*, 2010-Ohio-2121, ¶ 23, 187 Ohio App. 3d 437, 444

(citing *Comstock Homes, Inc. v. Smith Family Trust*, 9th Dist. No. 24627, 2009-Ohio-4864, 2009 WL 2952776, ¶ 8). (Also noting that if a party to a contract "neglects or refuses to perform a material promise in a contract, there is a failure of consideration.") (Internal citations omitted)). Moreover, "[i]f an employer materially breaches the employment agreement, it cannot enforce an otherwise valid restrictive covenant contained in the agreement." *Arthur J. Gallagher & Co. v. Anthony,* No. 16-CV-00284, 2016 WL 4523104, at *21 (N.D. Ohio Aug. 30, 2016).

Here, Defendants contend that Down-lite materially breached the 2013 Shareholder Agreement upon the following failures:

a. Down-lite failed to appoint and retain a permanent Board of Advisors under Section 13.6. (Tr. at 2-80). Had Down-lite maintained a board of outside, non-family advisors, it might not be in the financial situation in which it now finds itself.

b. Down-lite failed to provide consistent annual performance reviews to Defendant under Section 13.9(b). (Tr. at 1-256). Down-lite's lack of consistency resulted in a lack of uniform direction, compensation and evaluation for Defendant and other company employees.

c. Down-lite failed to convene annual Family Council meetings consistently as mandated by Section 13.10. (Tr. at 4-59; 3-79, 3-115). Holding regular family council meetings could have prevented the misinformation, lack of direction, and dysfunction that appeared at the hearing.

d. Down-lite failed to give owners Robert Altbaier and Larry Werthaiser an opportunity to object to the decision to sue Defendant. (Tr. at 4-69). Down-lite deliberately side-stepped this requirement to avoid the process set forth in 13.9 and gain a tactical advantage in litigation. Down-lite failed to comport with standards of good faith and fair dealing.

e. Down-lite created a "G 1.5" employment level with attendant vague duties and requirements without holding a vote and/or reducing the requirements to writing or a vote. (Tr. at 1-145; 2-5; 3-42).

f. Two other parties to the 2013 Shareholder Agreement (Marvin Werthaiser and his daughter, Hailey) surreptitiously created a new business entity in the event Down-lite fails. Down-lite has not taken any actions against them to

enforce their Restrictive Covenants. (Tr. at 2-126). Down-lite failed to comport with standards of good faith and fair dealing.

g. Down-lite failed to observe the corporate formalities necessary to affect the 2013 Shareholder Agreement.

Defendants argue that each of these breaches alone or and in combination are material; and establish that Down-lite materially breached the agreement. Defendants assert that Down-lite's conduct does not comport with the standards of good faith and fair dealing.

In the alternative, assuming Down-lite's actions did not materially breach the agreement, Defendants further contend that the restrictive covenants outlined in the Shareholder Agreement are not enforceable under Ohio law because they are unreasonable. As noted above, the Ohio Supreme Court has adopted a "reasonableness" standard for restrictive covenants, which is to be determined on a case-by-case basis. *Raimonde v. Van Vlerah*, 42 Ohio St.2d 21, 25–26, 325 N.E.2d 544, 547 (1975). A party seeking to enforce such a contract must show, by clear and convincing evidence, that the restrictive covenants are "[1] no greater than is required for the protection of the employer, [2] do[ ] not impose undue hardship on the employee, and [3] [are] not injurious to the public." *FirstEnergy Solutions Corp. v. Flerick*, 521 Fed.Appx. 521, 525–26 (6th Cir. 2013) (citing *Raimonde*, 325 N.E.2d at 544).

Here, the 2013 Shareholder Agreement contains a two-year non-competition restriction. In this regard, "Ohio Courts have recognized only two legitimate business interests that are sufficient to support enforcement of a noncompetition agreement," and that those interests are "preventing the disclosure of the former employer's trade secrets or the use of the former employer's proprietary customer information to solicit the former

employer's customers." *Horter Inv. Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 907 (S.D. Ohio 2017) (citing *Brentlinger Ents. v. Curran*, 141 Ohio App.3d 640, 752 N.E.2d 994 (Ohio Ct. App. 10 Dist. 2001)).

Applying the *Raimonde* factors to the facts of this case, Defendants contend that the restrictions are unreasonable. Notably, Defendants assert the 2013 Shareholder Agreement contains a two-year non-competition restriction. The two years, however, do not start until the signatory "ceases to hold any Shares" in the business. Additionally, since Defendant himself is not an individual shareholder, rather one of three co-trustees of a trust that holds non-voting shares in Down-lite, he contends that he cannot cease to hold shares without the consent of his co-trustees to sell shares back to Down-lite under the terms set forth therein. Further, even if his two co-trustees consented, there is no provision that would allow the trust to sell shares that are negatively valued. Finally, Defendants argue that the trust agreement does not provide a procedure by which an individual co-trustee can cease holding shares. Thus, Defendants contend that the only way for Defendant Altbaier to cease holding shares would be to re-write both the 2013 Shareholder Agreement and the trust document, which he cannot do unilaterally. Because there is no time at which Defendant Altbaier can cease holding shares, the duration of the restrictive covenant lingers in perpetuity. In this regard, Defendant notes that Ohio Courts will not enforce an endless restrictive covenant.

Defendants further contend that the covenants are designed to stifle Mr. Altbaier's inherent skills and expertise. Defendant Altbaier's skills and expertise were self-taught. In this regard, Defendants argue that no one at Down-lite shared company trade secrets or proprietary information to educate him.

In addition, Defendants argue that the benefit of the restrictions to Down-lite are grossly disproportionate to the extreme burden they place upon Mr. Altbaier and PAICE. Moreover, any detriment to Down-lite is largely of its own doing based on its unwillingness to partner with Defendants to sell Down-lite's down to outerwear customers in an independent sales representative capacity.

As such, Defendants argue that Down-lite seeks to prevent Defendants from engaging in activities well beyond the sale of down insulation to outerwear brands. That is, Down-lite seeks to prevent Defendants from engaging in markets in which Down-lite does not even conduct business. Moreover, the large majority of Down-lite's business is in bedding and furniture. PAICE was not formed to conduct any business in those areas.

Moreover, Defendants contend that Down-lite failed to proffer any evidence demonstrating that Defendant Altbaier breached any of the provisions of the restrictive covenants at issue. There were a handful of text messages that were social in nature and fully consistent with Defendant Altbaier's prior social contacts with those individuals. There were a few email messages that related to non-competitive business, such as selling zero-down insulation to the outerwear market or making connections to further non-competitive consulting arrangements. Defendant Altbaier contends that his distribution of a benign survey to former customer contacts following his departure from Down-lite, but before the issuance of the TRO, did not breach the restrictive covenants. In light of the foregoing, Defendant Altbaier contends that these contacts do not qualify as breaches of the restrictions. The undersigned agrees.

Upon careful review of the evidence and the arguments of the parties, the undersigned finds that Plaintiff has not shown a likelihood of success on the merits relating to the breach of contract claim.

### 2. Trademark Claims

Down-lite also seeks injunctive relief on the trade secrets claim. To prevail on an OUTSA claim, a plaintiff must show "by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret." *Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008). *See also Murray Energy Holdings Co. v. Mergermarket USA, Inc.*, S.D. Ohio No. 2:15-CV-2844, 2016 U.S. Dist. LEXIS 79183, at *7 (June 17, 2016) (quoting *Heartland Home Fin.* For elements of OUTSA claim).

Information can be characterized as a "trade secret" only when it "derives independent economic value…from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from" it. (See, 18 U.S.C. § 1839(3) and O.R.C. 1333.61(D)). This case involves two types of alleged trade secrets: (i) customer lists and (ii) proprietary pricing information.

The Ohio Supreme Court established a six factor test to determine whether something warrants trade secret protection: (1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in

obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. (*See State ex rel. Besser v. Ohio State Univ.*, 87 Ohio St.3d 535 (2000), *quoting State ex rel. Plain Dealer v. Ohio Dept. of Ins.*, 80 Ohio St.3d 513, 524-525 (1997)).

Here, applying the factors outlined above, Plaintiff has failed to show that its customer list or pricing information constitute trade secrets. At the hearing, Down-lite described its "secret sauce" or confidential business information/trade secrets to include: Customer names, supply chain, contact information, marketing information, prices and margins, certifications and standards, information on "Down 101", and its manufacturing processes. However, this information is widely known in the industry and in many cases, proudly shared with suppliers and customers. (Tr. at 2-127 to 132; 2-138).

Down-lite permits the identity of its outerwear customers to be publicly available. It publicizes them on a brand board at trade shows. (Tr. at 3-108). It publicizes them on its website and in marketing materials. Down-lite makes no efforts to keep its customers' identities and other information confidential. (Tr. at 3-109). Down is a traded commodity, just like oil. (Tr. at 3-129). Down-lite's supply chain includes down and feather suppliers primarily in Asia. (Tr. at 1-71). For its sale of down to outerwear companies, Down-lite enters into written agreements with outerwear brands but supplies the down to independent cut-and-sew garment factories with whom the brand has contracted to make its products. (Tr. at 1-191). In most cases, Down-lite's down supplier in China ships directly to the garment factories in Asia. (Tr. at 1-190). In some cases, Down-lite processes the down and ships it to the factories. None of this is secret

or proprietary. Suppliers know the identities of the brands, customers, factories, and processors and vice versa. The down industry demands "supply chain transparency." (Tr. at 3-70).

Several websites, including trackmydown.com and panjiva.com, provide the public with detailed information about the down supply chain. (Tr. at 3-107). Contact information for Down-lite's outerwear brand buyers and customers is widely available to the public. The brands do not keep their contact information confidential. The contact information for Down-lite's largest outerwear customers is available on LinkedIn, as shown by the LinkedIn profiles entered into evidence. (Tr. at 2-144). Further, any outerwear trade show attendee can get a list of brand contact information from the trade show and many of the contact lists are also available on the internet. (Tr. at 3-108; 1-211).

Down-lite does not keep its marketing information and plans confidential. Information about the down and feather market and outerwear markets is available to anyone from a variety of market research firms. (Tr. at 1-216, 217).

Because down and feathers are agricultural commodities and subject to everchanging tariff practices, the prices on down and feathers are volatile and fluctuate. Thus, prices regularly change each month. (Tr. at 3-129). Down-lite has not created any certifications or standards in the industry. Rather, the few certification programs that apply to down and feathers are administered by third party organizations – such as the Textile Exchange for the "RDS" standard. (Tr. at 3-168). The processing of down and feathers is neither complicated nor secretive. (Tr. at 1-147,148). Down comes from either ducks or geese, in a few color gradations, and in different fill powers or rates,

depending on density. (Tr. at 1-7). Down is a by-product of the poultry industry. Farmers sell feathers and down to Down-lite, and Down-lite processes the material by separating the feathers from the down, then washing and drying the product. (Tr. at 3-159, 160). Down-lite does not make jackets or sleeping bags. Rather, it sells down to brands who use cut and-sew factories to make their jackets and sleeping bags. All of this information is publicly available. Down-lite publicizes "Down 101" in presentations that it gives publicly. (Tr. at 1- 147). There are dozens of articles on the internet that explain the process. Down-lite publicizes its processes through its collection of YouTube videos. (Tr. at 2-138).

Moreover, Robert Altbaier (a 1/3 owner of the company and someone who has been in the industry for more than 30 years), testified that Down-lite has no trade secrets. (Tr. at 3-126, "There are no such things as trade secrets in the down business…It's an open market"). The machinery utilized to process down and feather is used by practically every down and feather processor in the world, and the related processes and technology has been the same for nearly 50 years. (Tr. at 4-25).

Additionally, Down-lite failed to produce any evidence that Defendant Altbaier disclosed any of Down-lite's trade secrets. (Tr. at 2-71,72, 97).

In light of the foregoing, the undersigned finds that Down-lite has failed to establish a likelihood of success on the merits on its claims for trade secret misappropriation.

### B. Irreparable Harm

Irreparable harm exists when there is a substantial threat of material harm that cannot be adequately compensated through monetary damages. *Prosonic Corp. v.*

*Stafford*, 539 F.Supp.2d 999, 1007 (S.D. Ohio 2008), citing *Fraternal Order of Police v. Cleveland*, 141 Ohio App. 3d 63 (2001). Harm is "irreparable" only if it is "actual and imminent" as opposed to "speculative or unsubstantiated". Here, there is no evidence that Down-lite has lost a customer, order, or dollar of revenue as a result of any activity by Defendant or PAICE. Additionally, there was testimony at the hearing that Down-lite has continued to earn new business from outerwear customers since Defendant left the company.

### C. Harm to Others and Public Interest

With regard to determining the probability that granting a temporary restraining order will substantially harm others, "the focus is on the harm that a defendant will suffer[.]" *Lander v. Montgomery Cty. Bd. Comm'r*, 159 F. Supp. 2d 1044, 1053 n. 18 (S.D. Ohio 2001). Additionally, the public interest is served by having reasonable non-disclosure agreements enforced and preventing unfair competition. *See ALTA Analytics, Inc. v. Muuss*, 75 F.Supp.2d 773, 786 (S.D.Ohio 1999) ("the public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts.") (quoting *National Interstate Ins. Co. v. Perro*, 934 F.Supp. 883, 891 (N.D.Ohio 1996)). However, it also is served by ensuring that an individual's employment opportunities are not unduly restrained. Here, there is no evidence that Defendants improperly competed with Plaintiff or misappropriated any trade secrets. To the contrary, the evidence establishes that Defendant Altbaier worked diligently to close 80% of Down-lite's outerwear orders for the year during his last days of employment, and that those contracts will last for a year in most cases. Down-lite has not shown that its requested preliminary injunction would not harm others or that it would serve the public interest.

In sum, balancing the equities in this case, the Court concludes that a preliminary injunction is not well-taken and should not be granted.

**IV.     Conclusion**

For the reasons explained herein, **IT IS RECOMMENDED THAT** Plaintiff's motion for a preliminary injunction (Doc. 1) be **DENIED** and the previously entered TRO be dissolved.

*s/Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

DOWN-LITE INTERNATIONAL, INC.,                    Civil Action No. 1:19-cv-627

     Plaintiff,                                          Dlott, J.
                                                   Bowman, M.J

  vs.

DEFENDANT ALTBAIER, *et al.*,

     Defendants.


## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **FOURTEEN (14) DAYS** after being served with a copy thereof. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **FOURTEEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).