IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Down-Lite International, Inc., | : | |
| | : | Case No. 1:19-cv-627 |
| Plaintiff, | : | |
| | : | Judge Susan J. Dlott |
| v. | : | |
| | : | Order Rejecting Report and |
| Chad Altbaier, *et al.*, | : | Recommendation and Granting |
| | : | Preliminary Injunction |
| Defendants. | : | |

This matter is before the Court on the Report and Recommendation ("R&R") (Doc. 60)

issued on November 5, 2019 by Magistrate Judge Bowman and Plaintiff Down-Lite

International, Inc's Objection (Doc. 62) to the R&R. Down-Lite sued its former employee,

Defendant Chad Altbaier, and a company he formed, Defendant Paice Partners Global, LLC

("Paice"), to enjoin competitive activities allegedly in violation of a contract signed by Altbaier.

The Court must decide whether to adopt the Magistrate Judge's recommendation to deny a

preliminary injunction. Though Down-Lite initially sought injunctive relief on all counts of its

Complaint, the Objection to the R&R is based solely on its breach of contract claim. (Doc. 62 at

PageID 1541 n.2.) For the reasons that follow, the Court will **REJECT** the R&R and **SUSTAIN**

the Objection. The Court will preliminarily enjoin Altbaier from soliciting the sale of down to

Down-Lite's existing outdoor apparel customers through August 31, 2020 as further set forth in

this Order.

## I.     BACKGROUND

### A.     Factual History

The Magistrate Judge summarized the testimony and evidence obtained from the

preliminary injunction hearing in the R&R. (Doc. 60 at PageID 1515–1523.) The Court

incorporates that summary here with a few additions.

Altbaier signed an Amended and Restated Close Corporation and Shareholder Agreement

dated March 8, 2013 ("2013 Shareholder Agreement") as a Trustee of the Robert H. Altbaier

Family Grantor Trust dated 11/28/12 ("Altbaier Trust"). (Doc. 62-2 at PageID 1591, 1630; Doc.

62-3.) The 2013 Shareholder Agreement was also signed by Down-Lite, by Robert Altbaier—

one of three co-owners of Down-Lite[1]—as the Grantor of the Altbaier Trust, and by Chad

Altbaier's sisters as co-Trustees of the Altbaier Trust. (Doc. 62-2 at PageID 1591, 1629.) The

2013 Shareholder Agreement defined the term "Shareholder" to include the Trustees. (*Id.* at

PageID 1591, 1608.)[2] It contained the following restrictive covenants not to compete applicable

to all Shareholders:

10.3 Restrictive Covenants

(a) Covenant Not to Compete. (Mr. Altbaier) agrees that while he holds any
Shares and for a period of two (2) years after he ceases to hold any Shares, within
the United States, (he) shall not, directly or indirectly...be connected with, assist,
or have any interest in, any...entity which is engaged in, or is connected in any
manner with, any business in competition with the business then being conducted
by (Down-Lite).

(b) Corporation Customers. (Mr. Altbaier) acknowledges that all customers and
prospective customers of (Down-Lite) (the "Customers") before, as of, and after
the date hereof...shall be and remain solely the Customers of (Down-Lite). (Mr.
Altbaier) agrees that while he holds any Shares and for a period of two (2) years
after he ceases to hold any Shares...neither he, nor any...entity with which he is
associated...shall directly or indirectly solicit, attempt to obtain, or divert the
business of, or initiate any communication in any form to, or receive or process
any purchase, sales, or work order or accept any business of any nature from, or
perform any services for, any person who at any time while he held any Shares
shall have been a Customer, or aid or assist anyone else to do so, or attempt to
seek or cause any such Customer to cease doing business or decrease the amount
of business done with the Corporation. The restrictions contained in this section

---

[1] The three co-owners are referred to as the G1 owners, and their children are referred to as the G2 family members.

[2] Chad Altbaier does not personally own shares of Down-Lite, and he is defined as a Shareholder of Down-Lite
only by virtue of the terms of the 2013 Shareholder Agreement.

shall not apply to the sale of goods or services which are not, directly or indirectly, in competition with the business then being conducted by or any then prospective activities of the Corporation.

(c) Corporation Employees. (Mr. Altbaier) agrees that while he holds any Shares and for a period of two (2) years after he ceases to hold any Shares, neither he, nor any person, firm, corporation, or other entity with which he is associated or in which he has an interest, shall directly or indirectly solicit, entice, or encourage any person who within six months prior to the date he ceases to hold any Shares shall have been an employee of (Down-Lite) to leave his employment with (Down-Lite), or employ or engage, or attempt or agree to employ or engage, in any capacity, the services of any such person, or aid or assist anyone else to do so.

(d) Use and Disclosure of Confidential Information. (Mr. Altbaier) agrees that, except as specifically authorized by (Downlite) in writing, and except information which is generally known in the trade or industry, he shall not either while he holds any Shares or at any time after he ceases to hold any Shares directly or indirectly use, disseminate, disclose, discuss, lecture upon, or write or publish articles or other similar or dissimilar materials concerning any information disclosed to or conceived or known by him during, as a result of, or through his involvement with (Down-Lite) about (Down-Lite's) customers, prospective customers, suppliers, products, processes, services, fees, prices, methods, formulas, techniques, trade secrets, financial condition, plans, prospects, policies, or procedures, or uses or improvements thereof or know-how related thereto (all of the foregoing collectively the "Confidential Information").

(e) Corporation Assets. (Mr. Altbaier) acknowledges that he has no claim or rights with respect to any of (Down-Lite's)...lists or records of customers or prospective customers...good will...other intellectual property rights, or any other asset, tangible or intangible. At the time he ceases to hold any Shares, (Mr. Altbaier) shall deliver to (Down-Lite) all...documents...software programs or media, and all other similar and dissimilar written or soft-copy repositories containing any information concerning (Down-Lite), including Confidential Information, and all copies thereof in his possession or under his control, whether prepared by (Mr. Altbaier), (Down-Lite), or anyone else.

(f) Reasonableness. (Mr. Altbaier) carefully considered the nature and extent of the restrictions upon him and the rights and remedies conferred upon (Down-Lite) under this Section, and hereby acknowledges and agrees that such covenants are reasonable, are designed to prevent irreparable damage to (Down-Lite), are required to protect (Down-Lite's) legitimate interests, and do not confer a benefit upon (Down-Lite) disproportionate to the detriment to (Mr. Altbaier). (Mr. Altbaier) represents to (Down-Lite) that, based on (his) experience and abilities, his observance of the covenants set forth in this Article, including without limitation the geographic areas and time periods covered, will not cause undue hardship to (Mr. Altbaier) or unreasonably interfere with his ability to earn a livelihood.

(g) <u>Covenants Independent; Extension; Survival</u>. The covenants set forth in this Section shall be construed as agreements independent of any other provisions of this Agreement, and the existence of any claim or cause of action by any Shareholder against the Corporation, whether based upon this Agreement or otherwise, shall not constitute a defense to the enforcement of such covenants. The time periods set forth in the first three Sections of this Article shall be extended automatically with respect to any Shareholder for any period of time during which he breaches any provision of such Sections. All such covenants shall survive termination of this Agreement.

(h) <u>Shareholder Defined</u>. For purposes of the covenants set forth in this section 10.3, the term "Shareholder" shall include...any trustee...or beneficiary of any such trust, and each Shareholder shall undertake to have any such trustee, grantor, and/or beneficiary of any trust owning Shares...."

(*Id.* at PageID 1607–1609 as summarized in Doc. 37 at PageID 421–423.) The 2013 Shareholder Agreement provided in ¶ 14.9 that it "shall be governed and construed in accordance with Section 1701.591 of the Ohio General Corporation law and all other the laws [*sic*] of the State of Ohio." (Doc. 62-2 at PageID 1626.)

The parties submitted additional evidence after the preliminary injunction hearing. Down-Lite submitted evidence indicating that the 2013 Shareholder Agreement was executed after more than a year of drafting, discussions, and meetings. (Doc. 62-1.) Bradley Haas, an attorney for Down-Lite, stated in an Affidavit that to the best of his recollection Altbaier attended a meeting of the G2 family members in November 7, 2011 to discuss a proposed agreement. (*Id.* at PageID 1563.) Haas provided Altbaier with an outline of the proposed agreement that included notice that the agreement would contain non-compete provisions in ¶ 10.3. (*Id.* at PageID 1575, 1579.)

Down-Lite also submitted evidence showing that Altbaier began working for Allied Feather and Down Corp. ("Allied"), a Down-Lite competitor, in late November or early December 2019 and was tasked with selling down in the outdoor apparel industry. (S. Uretsky Dep., Doc. 79-1 at PageID 1799.) Altbaier began his discussions with Allied shortly after he left

employment with Down-Lite and before the preliminary injunction hearing in August 2019. (D. Uretsky Dep., Doc. 79-1 at PageID 1824–1825.) He signed an employment agreement with Allied with a specific rider prohibiting the non-disclosure of Allied's proprietary information defined to include information concerning Allied's business relationships. (Doc. 79-1 at PageID 1847–1848.)

Defendants responded in part by filing a Declaration by Altbaier. (Doc. 87-1.) He confirmed that he started working for Allied on December 2, 2019 and that he was first contacted by Allied in July 2019, but he asserted that his conversations with Allied prior to the issuance of the Report and Recommendation were "general and superficial in nature." (*Id.* at PageID 2023.) He also stated that he "did not have the opportunity to negotiate any of the terms of the 2013 Shareholder Agreement," but he did not deny or address the statement by Haas that he attended a G2 family members meeting in December 2011 to discuss the proposed agreement. (*Id.* at PageID 2022.)

## B. Procedural Posture

Down-Lite filed suit against Altbaier and Paice on July 19, 2019 in the Court of Common Pleas for Hamilton County, Ohio. (Doc. 4.) On July 22, 2019, the state court issued a temporary restraining order ("TRO") against Altbaier and in favor of Down-Lite:

> (1) Mr. Altbaier is prohibited and enjoined from accessing, using, disseminating, disclosing, communicating, or otherwise distributing any Downlite trade secrets or confidential information, including but not limited to information related to any Downlite customer; and (2) Mr. Altbaier is prohibited and enjoined from working for any Downlite competitor, including competing self-employment, within the continental United States.

(Doc. 1-4 at PageID 142–143.)

Defendants removed the action to federal court on July 29, 2019. In an Order dated August 8, 2019, the Magistrate Judge extended the TRO through "such time as the hearing on the

preliminary injunction is concluded." (Doc. 18 at PageID 296.) She then conducted a four-day evidentiary hearing from August 26–29, 2019 to determine whether to recommend that the Court grant Down-Lite a preliminary injunction. (Docs. 42–45). On November 5, 2019, she issued the R&R recommending that the Court deny the preliminary injunction and dissolve the TRO. (Doc. 60 at PageID 1537.)[3] Down-Lite then filed the pending Objection, which Defendants oppose. Pursuant to Down-Lite's request, the Court held oral argument on January 28, 2019.

## II. STANDARD OF REVIEW

Rule 72(a) of the Federal Rules of Civil Procedure authorizes magistrate judges to decide nondispositive matters which have been referred to them. Upon timely objection by a party, the district judge must "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). The clearly erroneous standard applies to a magistrate judge's findings of fact and the contrary to law standard to her conclusions of law. *See Gandee v. Glaser*, 785 F. Supp. 684, 686 (S.D. Ohio 1992), *aff'd*, No. 92-3304, 1994 WL 83265 (6th Cir. Mar. 14, 1994). "A finding is clearly erroneous where it is against the clear weight of the evidence or where the court is of the definite and firm conviction that a mistake has been made." *Galbraith v. N. Telecom, Inc.*, 944 F.2d 275, 281 (6th Cir. 1991), *overruled on other grounds*, *Kline v. Tenn. Valley Auth.*, 128 F.3d 337 (6th Cir. 1997). A decision is contrary to law if the magistrate judge has ignored or misapplied the applicable law found in the Constitution, statutes, or case precedent. *See Gandee*, 785 F. Supp. at 686; *Hood v. Midwest Sav. Bank*, No. C2-97-218, 2001 WL 327723, at *2 (S.D. Ohio Mar. 22, 2001).

---

[3] There is confusion in the record regarding when the TRO was dissolved. On one hand, the TRO appears to have been dissolved on August 29, 2019, the last day of the preliminary injunction hearing, pursuant to the Order dated August 8, 2019. This Court affirmed that the Magistrate Judge had the authority to dissolve the TRO as a non-dispositive order. (Doc. 48 at PageID 1304.) However, the Magistrate Judge recommended dissolving the TRO in the R&R as if it still was in force. The Court informed the parties that due to the confusion in the record it would not hold Altbaier in contempt of court for alleged violations of the TRO occuring from August 29, 2019 through the present Order.

## III. PRELIMINARY INJUNCTION STANDARD

The decision to grant a request for interim injunctive relief falls within the sound discretion of the district court. *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 102 (6th Cir. 1982). The district court considers the following four factors: (1) whether the movant has demonstrated a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether issuance of preliminary injunctive relief would cause substantial harm to others; and (4) whether the public interest would be served by issuance of preliminary injunctive relief. *See City of Pontiac Retired Emps Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam); *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000); *Devicor Med. Prods., Inc. v. Reed*, No. 1:11CV645, 2013 WL 1315037, at *12 (S.D. Ohio Mar. 29, 2013).

Usually no single factor is determinative of the availability of a preliminary injunction. *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). The extent to which a party must demonstrate a substantial likelihood of success generally varies inversely with the degree of harm that party will suffer absent an injunction. *Roth v. Bank of the Commonwealth*, 583 F.2d 527, 538 (6th Cir. 1978) (citation omitted). However, the failure to demonstrate the existence of an irreparable injury absent a preliminary injunction can be fatal to a motion for preliminary injunction. *See So. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991).

## IV. ANALYSIS

### A. Probability of Success on the Merits

The Court begins its analysis by examining whether Down-Lite has shown a probability of success on the merits. That is, should Altbaier and Paice be enjoined from competing with Down-Lite pursuant to the restrictive covenant in the 2013 Shareholder Agreement? This

requires the Court initially to resolve whether California or Ohio law applies. The Magistrate Judge applied Ohio law to the current dispute without explicitly deciding that Ohio law controlled over California law.

### 1. Choice of Law

A federal court sitting in diversity applies the conflict-of-law rules of the forum state. *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir. 1999). Ohio has adopted the approach of the Restatement (Second) Conflict of Laws §§ 187–188. *See Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 714–715 (6th Cir. 2015); *Schulke Radio Productions, Ltd. v. Midwestern Broadcasting Co.*, 6 Ohio St. 3d 436, 453 N.E.2d 683, 686 (1983). Pursuant to § 187(1), contractual choice of law provisions generally are enforced. *Wise*, 780 F.3d at 715. Section 187(2)(b), nonetheless, instructs that courts should not apply the law of the chosen state if doing so would violate the public policy of another state with a greater material interest in the dispute and such other state would be the state of the applicable law absent the choice-of-law provision. *See, e.g., Id.*; *Lifestyle Improvement Centers, LLC v. E. Bay Health, LLC*, No. 2:13-cv-735, 2013 WL 5564144, at *4–5 (S.D. Ohio Oct. 7, 2013); *Contech Const. Prods. Inc. v. Blumenstein*, No. 1:11cv878, 2012 WL 2871425, at *8–9 (S.D. Ohio July 12, 2012).

Here, the 2013 Shareholder Agreement at ¶ 14.9 contained a choice-of-law provision in favor of Ohio. The Court should apply Ohio law, therefore, unless doing so would violate the public policy of another state with a greater material interest in this dispute and unless that state's law would apply absent the choice-of-law provision. Altbaier and Paice assert that California law, not Ohio law, should apply. Down-Lite asserts that the Ohio law should apply pursuant to the choice-of-law provision.

To begin, enforcement of covenants not to compete is against the public policy of California. "Except as provided in this chapter, every contract by which anyone is restrained from engaging in a lawful profession, trade, or business of any kind is to that extent void." Cal. Bus. & Prof. Code § 16600. This Court previously recognized that "California's long history of ensuring its employees' right to pursue lawful employment demonstrates a powerful public policy." *Contech Const. Prods.*, 2012 WL 2871425, at *11; *see also Lifestyle Improvement Centers*, 2013 WL 5564144, at *9 (calling California's policy against covenants not to compete "fundamental"). Thus, California law prohibits noncompete agreements in most circumstances and probably would bar enforcement of the covenants not to compete in the 2013 Shareholder Agreement.

The Court, therefore, must determine whether California has a greater material interest in the dispute and whether California law would control absent the Ohio choice-of-law provision in the 2013 Shareholder Agreement. The law of the state with "the most significant relationship to the transaction and the parties" controls. *Russell v. GTE Gov't Sys. Corp.*, 232 F. Supp. 2d 840, 848 (S.D. Ohio 2002) (citation omitted). To evaluate the significance of a state's relationship to the transaction, Restatement (Second) Conflict of Laws § 188(2) directs courts to consider five factors: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation, and place of business of the parties. *Contech Const. Prods.*, 2012 WL 2871425, at *9; *Russell*, 232 F. Supp. 2d at 849.

Regarding the place of negotiation and of contracting, both parties agree that Altbaier signed the 2013 Shareholder Agreement in California. However, before signing the 2013 Shareholder Agreement, Altbaier attended at least one meeting on November 7, 2011 with other

9

G2 members presumably in Ohio to discuss the terms of the proposed new shareholder agreement. (Haas Aff., Doc. 62-1 at PageID 1563–1564, 1579.) Relatedly, the residency or location of the parties is split. Altbaier resides and works in California.[4] Conversely, Down-Lite is registered in and has its principal place of business in Ohio.

As to the place of performance and location of the subject matter of the contract, the 2013 Shareholder Agreement, and the related Altbaier Trust, concerned ownership and governance of Down-Lite, an Ohio corporation.[5] This fact distinguishes this case from the typical non-compete case in which the restrictive covenant is contained in an employment contract. The subject matter of the 2013 Shareholder Agreement is broadly focused on Down-Lite, but a typical employment contract is more narrowly focused on the employment of one individual. Neither party offered specific evidence about what duties Altbaier performed under the 2013 Shareholder Agreement or where he performed those duties. Certain obligations under the contract, however, were most likely to be performed in Ohio where the company was located, and not likely to be performed in California. These include the meeting of the board of directors, voting on compensation issues by the board of directors, employment decisions by the CEO concerning family members, and voting on the position of CEO. The weight of these factors tips the scales in favor of finding that Ohio has the greater material interest in the dispute and that Ohio law should govern in the absence of a choice-of-law provision.

The cases cited by Defendants in favor of California law are distinguishable. In *Contech Construction Products,* the employers-plaintiffs were subsidiary and parent corporations located in Minnesota and Ohio, respectively, and the former employee-defendant who signed a non-

---

[4] The citizenship of Paice is not relevant because Paice is not a party to the 2013 Shareholder Agreement, nor was it in existence when the contract was signed.

[5] The implicit situs of the Altbaier Trust is Ohio. Paragraph 5.1 states that the Trustee can transfer the situs of administration of the trust from Ohio to another jurisdiction. (Doc. 62-3 at PageID 1660.)

compete agreement lived in and worked in California. 2012 WL 2871425, at *13. This Court

held that California should be applied over Ohio law. *Id.* The employee lived and worked in

California before he joined the Minnesota company, he performed his job duties in California,

and he negotiated the terms of his employment from California. *Id.* at *2, 13. The restrictive

covenant was contained in a typical employment contract, and the employee told the employer

when he signed the contract that covenants not to compete were unenforceable in California. *Id.*

at *2. The Court's key holding was that both California, where the employee lived, and

Minnesota, where the subsidiary was located, had stronger interests in the dispute than Ohio,

where the parent company was located. *Id.* at *13. In this case, Altbaier lived in and worked for

Down-Lite in Ohio before he moved to California. Additionally, Altbaier was employed directly

by the Ohio company without the complicating factor of being employed by a subsidiary located

in another state. Finally, the restrictive covenant here is contained in a broad shareholder

agreement, not in a typical employment agreement.

Additionally, *Lifestyle Improvement Centers* can be distinguished easily. Not only were

the defendants located in California, but the franchise business that defendant was to operate was

located in California, and contract negotiations occurred in California. 2013 WL 5564144, at

*1–2, 8. Finally, in *Power Marketing Direct, Inc. v. Ball*, No. C2-03-1001, 2004 U.S. Dist.

Lexis 30016 (S. D. Ohio June 28, 2004), the defendant lived in California, operated as a dealer in

California, and received training from the plaintiff in California, and the plaintiff operated a

warehouse in California. *Id.* at *7, 11–12. Conversely, here, Altbaier was living in California,

but he worked for a company located in Ohio. Down-Lite did not hold training, nor operate a

franchise or warehouse, in California. In sum, the cited cases do not compel a different

conclusion. The Court holds that Ohio has the most significant relationship to the contract and the parties. Ohio law will be applied in this case.

## 2. Applying Ohio Law

### a. Standard for Enforcing Restrictive Covenants Not to Compete

Ohio law enforces noncompete agreements "to the extent necessary to protect the employer's legitimate interests." *Raimonde v. Van Vlerah*, 42 Ohio St. 2d 21, 325 N.E.2d 544, 547 (1975). "A covenant restraining an employee from competing with his former employer upon termination of employment is reasonable if it is no greater than is required for the protection of the employer, does not impose undue hardship on the employee, and is not injurious to the public." *Id.* Protecting trade secrets and protecting against the use of "proprietary customer information to solicit the former employer's customers" are two legitimate interests that can be protected by a restrictive covenant not to compete. *Horter Investment Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 907 (S.D. Ohio 2017). Another legitimate interest is protecting personal relationships with the company's customers that the employee developed when representing the company. *Id.* at 907–908; *AK Steel Corp., v. Miskovich*, No. 1:14CV174, 2014 WL 11881029, at *12 (S.D. Ohio Apr. 17, 2014).

The Ohio Supreme Court set forth these factors to determine reasonableness of the restrictive covenant if the employer has legitimate interests to protect:

- the absence or presence of limitations as to time and space;
- whether the employee represents the sole contact with the customer;
- whether the employee is possessed with confidential information or trade secrets;
- whether the covenant seeks to eliminate competition which would be unfair to the employer or merely seeks to eliminate ordinary competition;
- whether the covenant seeks to stifle the inherent skill and experience of the employee;
- whether the benefit to the employer is disproportional to the detriment to the employee;
- whether the covenant operates as a bar to the employee's sole means of support;

12

- whether the employee's talent which the employer seeks to suppress was actually developed during the period of employment;
- and whether the forbidden employment is merely incidental to the main employment.

*Raimonde*, 325 N.E.2d at 547 (format changed and citation omitted). Courts are permitted to modify or amend restrictive covenants to make them reasonable. *Id.*

### b.    Down-Lite's Protectable Business Interests

The Magistrate Judge appeared to conclude in the R&R that Down-Lite did not establish that it had legitimate business interests to protect. The Court disagrees. This is an unusual case where the corporation's basic customer lists, supply chain information, and pricing information are not protectable interests.[6] However, Down-Lite has established a protectable interest in the customer relationships Altbaier developed with its outdoor apparel customers. The following facts set forth in the R&R are indicative of a protectable interest:

> Mr. Altbaier worked with "complex and technically nuanced products" and was Down-Lite's sole salesperson for outerwear. (Tr. 1, Doc. 42 at PageID 516, 556.) He had minimal oversight and "kind of dictated" what he did. (*Id.* at PageID 732). He developed "significant relationships," including strong personal relationships and friendships for Down-lite. (*Id.* at PageID 517.) Importantly, he developed "great trust and great goodwill" with these customers and their key personnel. (*Id.* at PageID 517–518, 527.) And, most significantly, Mr. Altbaier's relationship with the key personnel of Down-Lite's top five outdoor customers was especially strong/tight. (*Id.* at PageID 527.) Those five customers will account for $25,000,000 in annual revenue in 2019: 17% of all Down-Lite revenue. (*Id.* at PageID 527–528.)

---

[6] Its customer lists are not protectable because Down-Lite promoted its customer partnerships in visual displays at trade shows and on the internet. (Tr. 1, Doc. 42 at PageID 694; Tr. 3, Doc. 44 at PageID 1101.) Likewise, supply chain information is not protectable because the supply chains for down feathers are publicly-known. Public websites provide detailed information about supply chains. (Tr. 2, Doc. 43 at PageID 917–918; Tr. 3, Doc. 44 at PageID 1063, 1100–1102.) There is a certification for transparency and traceability in supply chains. (Doc. 44 at PageID 1160.) Finally, pricing information is not protectable because down feathers are a commodity. (Tr. 1, Doc. 42 at PageID 556; Tr. 4, Doc. 45 at PageID 1175.) The price of down is set by and fluctuates with the market. (Tr. 1, Doc. 42 at PageID 737.) Margins are dynamic, are based partially on the market, and change over time. (Tr. 4, Doc. 45 at PageID 1175.)

(Doc. 60 at PageID 1516 (citations updated).) Also, Altbaier had no relationships in the outdoor apparel industry before starting at Down-Lite. (Tr. 1, Doc. 42 at PageID 515.) It took a period of years to build the outdoor apparel business by developing the customer relationships. (Tr. 1, Doc. 42 at PageID 593; Tr. 2, Doc. 43 at PageID 914, 924–926.) This evidence is bolstered by the fact that Allied, Down-Lite's competitor and the company for whom Altbaier began to work in late 2019, also considered information related to its customer relationships to be proprietary and confidential. Allied required Altbaier to sign a confidentiality agreement which prohibits Altbaier from disclosing any information related to its business relationships. (Doc. 79-1 at PageID 1847–1848.) Allied refused to disclose in discovery even the identity of customers or potential customers with whom Altbaier has communicated on its behalf because it believed such information to be proprietary. (S. Uretsky Dep., Doc. 79-1 at PageID 1799, 1801, 1813; D. Uretsky Dep., Doc. 79-1 at 1829–1830.)

    For purposes of determining the likelihood of success on the merits, the Court concludes that Down-Lite has protectable interests in its customer relationships sufficient to support the enforcement of a reasonable restrictive covenant not to compete. The Court, therefore, will turn next to the *Raimonde* reasonableness factors.

    c.    ***Raimonde* Reasonableness Factors**

    The first factor questions the reasonableness of the time and space restrictions in the restrictive covenant. The non-compete provision in ¶ 10.3(a) by its terms applied within the United States. (Doc. 62-2 at PageID 1607.) Paragraph 10.3(b) prohibited the solicitation of Down-Lite's customers and prospective customers. (*Id.*) Courts have upheld nationwide restrictive covenants. *See, e.g., Horter Investment*, 257 F. Supp. 3d at 905 (stating that a nationwide restriction is reasonable for a company that operates nationwide); *Try Hours, Inc. v.*

*Douville*, 985 N.E.2d 955, 966 (Ohio App. 2013) (same). Nonetheless, the Court does not find a geographic-based restriction to be reasonable here. Down-Lite's protectable interest is its customer relationships. Therefore, the Court will restrict Altbaier only from competing to sell down to Down-Lite's existing outdoor apparel customers as of the date he left employment with Down-Lite at the end of June 2019.[7]

The 2013 Shareholder Agreement provided that the restriction applied while the Shareholder "holds Shares and for a period of two (2) years after he ceases to hold any shares." (Doc. 62-2 at PageID 1607.) Altbaier did not directly hold shares in Down-Lite, but he was defined as a Shareholder in the Agreement because he was a Trustee of the Altbaier Trust. (*Id.* at PageID 1608.) Paragraph 3.2 of the Altbaier Trust gave Altbaier the authority to resign as a Trustee. (Tr. 2, Doc. 43 at PageID 775–776; Doc. 62-3 at PageID 1655.) Altbaier would no longer be considered a Shareholder for purposes of the 2013 Shareholder Agreement and its restrictive covenant after he resigned as a Trustee. Down-Lite did not explain what duties Altbaier actually performed as a Trustee nor establish that he learned confidential information through that position. Accordingly, Down-Lite did not prove a reasonable basis to tie the length of the restrictive covenant to the time period that Altbaier serves as a Trustee. The Court will instead tie it to the end of his employment.

A restriction lasting for approximately one year would reasonably protect Down-Lite's protectable interest in its customer relationships. Altbaier testified that most of Down-Lite's contracts with its down customers were signed in May or June of one year and lasted through August of the next year. (Tr. 4, Doc. 45 at PageID 1192.) Lisa Pruett, the now former CEO, concurred that down contracts lasted for up to one year, but she also testified that some sales

---

[7] The Court intends the phrase "existing outdoor apparel customers" to be interpreted as customers under contract at the end of June 2019.

15

negotiations for 2019–2020 still were taking place in August 2019. (Tr. 2, Doc. 43 at PageID 854–855.) The contracts that Altbaier facilitated in May and June 2019 for Down-Lite before he resigned his employment will last through August 2020. Likewise, the contracts for down insulation that Down-Lite secures with its customers between May and August of 2020 will last through the summer of 2021. Prohibiting Altbaier from soliciting Down-Lite's existing customers through the end of August 2020 should protect contracts with those customers through the summer of 2021.

The next factor is whether Altbaier was the sole contact with the customers covered by the terms of the restrictive covenant. He was. As he stated in the Paice business plan, Altbaier was the founder and head of Down-Lite's outdoor division. (Doc. 62-4 at PageID 1665.) Altbaier was the person who developed Down-Lite's relationship with its major outdoor apparel customers, and he was "the face" of Down-Lite to those customers. (Tr. 2, Doc 43 at PageID 957.) Down-Lite did not have a subordinate assisting Altbaier with sales to outdoor apparel customers. (Tr. 3, Doc. 44 at PageID 1045.) These facts support restricting Altbaier from competing against Down-Lite for its existing customers for a reasonable period.

Whether Altbaier had access to confidential information or trade secrets also is relevant. Down-Lite has not established to this point that Altbaier had access to trade secrets. However, the Court discussed earlier the evidence indicating that Altbaier formed strong relationships with down customers during his employment at Down-Lite. Altbaier testified that he obtained an "understanding of the specific needs and buying behavior[s]" of down industry customers. (Tr. 1, Doc. 42 at PageID 586–589; Doc. 62-4 at PageID 1664.) This is the type of information the modified restrictive covenant would protect.

The Court also must examine whether the restrictive covenant restricts ordinary competition or unfair competition. The restrictive covenant at ¶¶ 10.3(a) & (b) prohibited all competition by prohibiting Altbaier from selling or facilitating the sale of down in the outdoor apparel market or from selling to any current or prospective customer of Down-Lite. (Doc. 62-2 at PageID 1607.) As stated above, Down-Lite has not established protected interests in its basic customer lists, supply chain information, or pricing information because of special factors in the down industry. It would be unreasonable to broadly prohibit Altbaier from working for a competitor in these circumstances. However, it is reasonable to restrict Altbaier from taking advantage of the customer relationships that he developed selling to the outdoor apparel market during his tenure at Down-Lite to the detriment of Down-Lite.

Next, the Court examines whether the restrictive covenant restricts Altbaier's inherent skill and expertise. Altbaier did not undergo a formal training program, but rather he only rotated through different positions at the company. (Tr. 2, Doc. 43 at PageID 942–943.) Down-Lite did not identify any person who served as a sales mentor to Altbaier on behalf of the company. Altbaier developed the outdoor apparel market for Down-Lite himself. (Tr. 1, Doc. 42 at PageID 515–516.) Altbaier's father testified that the "secret" to selling a commodity like down was "salesmanship." (Tr. 3, Doc. 44 at PageID 1122.) Another G1 owner, Marvin Werthaiser, testified that Altbaier was a "great salesman" who "knows how to open doors." (Tr. 2, Doc. 43 at PageID 915.) This evidence suggests that Altbaier has inherent selling skills, but those selling skills could transfer to markets other than the sale of down insulation to Down-Lite's outdoor apparel customers.

The next factors require the Court to weigh whether the benefit to Down-Lite is disproportional to the detriment to Altbaier and whether the covenant bars Altbaier's sole means

17

of support. Down-Lite likely will suffer a loss of sales because Altbaier left the company. Altbaier was the primary salesperson for Down-Lite on $30 million to $40 million of revenue in 2019. (Tr. 1, Doc. 42 at PageID 516, 527.) Altbaier's top five customers constituted approximately $25 million in revenue for Down-Lite in 2019. (*Id.* at PageID 527.) Down-Lite's CEO estimated that it would take Down-Lite two years to find and train a replacement salesperson for the outdoor apparel business. (Tr. 2, Doc. 43 at PageID 863.) The detriment to Down-Lite is greater if Altbaier directly competes for Down-Lite's existing outdoor apparel customers. On the other hand, Altbaier will suffer a detriment in not being able to compete to sell down to Down-Lite's existing outdoor apparel customers through the end of the 2020 summer selling season. That detriment is mitigated to the extent that Altbaier is permitted to sell down to other outdoor apparel companies and in other markets.

### d.    Whether Down-Lite Materially Breached the Contract

Before concluding the likelihood of success on the merits analysis, the Court will address Defendants' argument that the restrictive covenant in the 2013 Shareholder Agreement is not enforceable because Down-Lite breached the contract in material respect. "A material breach occurs when a party violates a term essential to the purpose of the agreement." *Freeman Indus. Prods., L.L.C. v. Armor Metal Grp. Acquisitions, Inc.*, 193 Ohio App. 3d 438, 952 N.E.2d 543, 552 (2011) (citation omitted). "If an employer materially breaches the employment agreement, it cannot enforce an otherwise valid restrictive covenant contained in the agreement." *Arthur J. Gallagher & Co. v. Anthony*, No. 16-CV-00284, 2016 WL 4523104, at *21 (N.D. Ohio Aug. 30, 2016). Defendants assert that Down-Lite materially breached the 2013 Shareholder Agreement in several ways, including the failure to issue yearly performance reviews as required by ¶ 13.9(b), the failure to maintain an outside board of advisors as required by ¶ 13.6, and the

failure to hold annual meetings of the three ownership families as required by ¶ 13.10. (Doc. 62-2.)

Down-Lite denies that it breached the contract in material respect, but it also argues that a material breach would not excuse compliance with the restrictive covenant. The Court agrees insofar as the Court finds that a material breach would not excuse compliance with the restrictive covenant. The restrictive covenant stands independent of other provisions in the 2013 Shareholder Agreement. The survival clause in ¶ 10.3(g) stated that "[t]he covenants set forth in this Section shall be construed as agreements independent of any other provisions of this Agreement, and the existence of any claim or cause of action by any Shareholder against the Corporation, whether based upon this Agreement or otherwise, shall not constitute a defense to the enforcement of such covenants." (Doc. 62-2 at PageID 1608.) A different court in the Southern District of Ohio enforced a similar provision to defeat an employee's argument that his former employer could not enforce a restrictive covenant against him based on the company's own material breaches. *Neely v. Crown Solutions Co., LLC*, No. 3:13-cv-109, 2013 WL 6056205, at *18–20 (S.D. Ohio Nov. 15, 2013), *report and recommendation adopted by*, 2014 WL 1091977 (S.D. Ohio Mar. 18, 2014). The plain language of ¶ 10.3(g) here compels the conclusion that the restrictive covenant is enforceable even if Down-Lite materially breached other provisions of the 2013 Shareholder Agreement.

e.    **Conclusion**

Down-Lite has established a likelihood of success on the merits. It has an interest in protecting the relationships Altbaier developed with its outdoor apparel customers over the course of several years. A limited injunction, designed to protect those customer relationships

through this upcoming summer 2020 contracting season, is reasonable to protect Down-Lite's interests without unduly burdening Altbaier's ability to make a living.

**B.     Remaining Preliminary Injunction Factors**

**1.     Whether Down-Lite Will Suffer Irreparable Injury**

Down-Lite argues that it would suffer irreparable injury if Altbaier is able to work for a competitor and/or solicit its customers. Generally speaking, "the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). As already discussed, Altbaier's sales to outdoor apparel companies accounted for $30 to $40 million dollars in revenue for Down-Lite. He was the primary contact for these customers. Down-Lite was already in a precarious financial position, being subject to a workout agreement with the bank and having reduced the salaries of the Werthaiser and Altbaier family member employees. The Court concludes that Down-Lite would suffer irreparable injury if Altbaier is permitted to immediately solicit the sale of down to Down-Lite's existing outdoor apparel customers.

**2.     Whether a Preliminary Injunction Will Cause Substantial Harm to Others and Whether It Serves the Public Interest**

Altbaier will not suffer substantial harm if the restrictive covenant is enforced as modified herein. It bears noting that in ¶ 10.3(f) of the 2013 Shareholder Agreement, Altbaier agreed that complying with the restrictive covenants would "not cause undue hardship . . . or unreasonably interfere with his ability to earn a livelihood." (Doc. 62-2 at PageID 1608.) Moreover, Altbaier will be permitted immediately to use his sales skills, experience, knowledge of supply chains, and other skills to sell down to other outdoor apparel companies and in other markets.

As to the public interest, Ohio law provides that "the public interest is always served in the enforcement of valid restrictive covenants contained in lawful contracts." *ALTA Analytics, Inc. v. Muuss*, 75 F. Supp. 2d 773, 786 (S.D. Ohio 1999) (citation omitted).

IV. CONCLUSION

For the foregoing reasons, the R&R is **REJECTED**, and Down-Lite's Objections are **SUSTAINED**. The Court will enforce the restrictive covenant contained in the 2013 Shareholder Agreement as modified. Altbaier is preliminarily enjoined this date through August 31, 2020 from soliciting, directly or indirectly, or otherwise diverting away from Down-Lite, the sale of down insulation to companies who were Down-Lite's existing outdoor apparel customers as of June 30, 2019.

**IT IS SO ORDERED.**

Dated this 27th day of February, 2020.

BY THE COURT:

Susan J. Dlott
United States District Judge